**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA, THE STATES OF CALIFORNIA, COLORADO, CONNECTICUT, FLORIDA, GEORGIA, ILLINOIS, INDIANA, MARYLAND, MICHIGAN, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, TENNESSEE, TEXAS, THE COMMONWEALTHS OF MASSACHUSETTS AND VIRGINIA, AND THE DISTRICT OF COLUMBIA *ex rel.* AFCE LLC, a Wyoming Company,<br><br>                              Plaintiffs,<br><br>        vs.<br><br>EYEPOINT PHARMACEUTICALS, INC.,<br><br>                              Defendant. | Civil Action No.<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL**
**FALSE CLAIMS ACT AND STATE LAW COUNTERPARTS**

Relator brings this *qui tam* action to recover damages and civil penalties on behalf of the

United States of America and the various States arising from false or fraudulent statements,

records, and claims made or caused to be made by Defendant EyePoint Pharmaceuticals, Inc. or

their agents in violation of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, the California

False Claims Act, Cal. Gov't Code § 12650 *et seq.*; the Colorado Medicaid False Claims Act,

Colo. Rev. Stat. § 25.5-4-304 *et seq.*; the Connecticut False Claims Act, Conn. Gen. Stat. § 4-

274 *et seq.*; the District of Columbia False Claims Act, D.C. Code § 2-381.01 *et seq.*; the Florida

False Claims Act, Fla. Stat. § 68.081 *et seq.*; the Georgia Taxpayer Protection Against False

Claims Act, Ga. Code Ann. § 23-3-120 *et seq.*; the Illinois False Claims Whistleblower Reward

and Protection Act, 740 Ill. Comp. Stat. § 175/1 *et seq.*; the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq.*; The Maryland False Health Claims Act, Md. Code Ann. Health-Gen. § 2-601 *et seq.*; the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, § 5A *et seq.*; the Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq.*; the Nevada False Claims Act, Nev. Rev. Stat. § 357.010 *et seq.*; the New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1 *et seq.*; the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*; the New York False Claims Act, N.Y. State Fin. Law § 187 *et seq.*; the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 *et seq.*; the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*; the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq.*; and the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*

## INTRODUCTION

1.      EyePoint is a pharmaceutical company that develops drugs for use in connection with the treatment of eye diseases.  The company currently sells only two drugs: YUTIQ® and DEXYCU®.  DEXYCU® is indicated for the treatment of ocular inflammation following cataract surgery.  Since at least 2019, EyePoint has been illegally inducing ophthalmologists to prescribe DEXYCU® to their patients by providing two free samples for every single dose purchased.

2.      DEXYCU® competes head-to-head with DEXTENZA®, a drug produced by Ocular Therapeutix that is also used to treat ocular inflammation following cataract surgery. Both drugs were introduced to the United States market in 2019 and are reimbursed as separately payable, pass-through drugs by Medicare Part B.

3.      Although Medicare Part B provides reimbursement for both DEXYCU® and DEXTENZA®, many private insurers do not.  To edge out competition from DEXTENZA® and induce additional DEXYCU® purchases, EyePoint provides ophthalmologists with two free

samples of DEXYCU® for every single prescription purchased.  This allows physicians to utilize DEXYCU® on their privately insured patients without worrying about whether the private insurance will cover it.  It also induces the physicians to buy more DEXYCU® to treat their Medicare patients.

4.    Nearly 4 million cataract surgeries are performed in the United States each year and nearly 60% of cataract surgery patients are covered by Medicare Part B.  EyePoint is keenly aware that a significant portion of patients prescribed DEXYCU® are Medicare beneficiaries and that demand for cataract surgery is only growing as the American population ages.

5.    Rather than play by the rules to grow its business, EyePoint has opted to illegally induce prescriptions of DEXYCU® in violation of both the Anti-Kickback Statute, the federal False Claims Act, and various State laws.

## PARTIES

6.    Relator AFCE LLC is a Wyoming limited liability company with headquarters in Newport, Delaware.  AFCE LLC is equally owned by two Managing Members.  Each Managing Member has worked for Ocular Therapeutix, a pharmaceutical company that develops and markets ocular drugs that compete directly with EyePoint's ocular drugs.  "Relator," as used herein, refers to AFCE LLC and/or its Managing Members.

7.    Defendant EyePoint Pharmaceuticals, Inc. ("EyePoint") is a publicly traded company (NYSE: EYPT) incorporated in Delaware with its principal place of business in Watertown, Massachusetts.  EyePoint develops and sells drugs used to treat eye disorders.  It currently sells only two commercial products in the United States, YUTIQ® and DEXYCU®.  Since launching commercial sales of DEXCYU® in March 2019, EyePoint has generated approximately $22 million in revenues from the drug with sales consistently rising.  The third quarter of 2021 alone accounted for roughly $5 million in sales.  As EyePoint has repeatedly

informed its shareholders, the continued viability of the company depends in large part on its ability to successfully commercialize DEXYCU®.

8.   EyePoint currently co-promotes DEXYCU® with ImprimisRx, an ophthalmic-focused pharmaceutical company based in San Diego, California that is a wholly owned subsidiary of Harrow Health, Inc., a publicly traded pharmaceutical company (NYSE: HROW) incorporated in Delaware with its principal place of business in Nashville, Tennessee. ImprimisRx entered into a Commercial Alliance Agreement with EyePoint on August 1, 2020 that granted ImprimisRx the non-exclusive right to co-promote DEXYCU® in the United States.  Pursuant to the Agreement, EyePoint pays ImprimisRx a fee that is calculated based on the quarterly sales of DEXCYU® in excess of predefined volumes to specific customers of ImprimisRx in the United States.

<strong><u>JURISDICTION AND VENUE</u></strong>

9.   This action arises under the False Claims Act, 31 U.S.C. § 3729 *et seq*.

10.   This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 3131.  This Court has jurisdiction over the State law claims pursuant to 31 U.S.C. § 3732(b) because this action arises from the same transactions or occurrences as the action brought on behalf of the United States under 31 U.S.C. § 3730.

11.   Venue is proper in this district pursuant to 31 U.S.C. § 3732(a), which provides that "[a]ny action under § 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by § 3729 occurred."  Defendant EyePoint maintains its principal place of business in the District of Massachusetts.  Venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(2).

12.     There are no bars to recovery under 31 U.S.C. § 3730(e).  Specifically, this suit is not based upon prior public disclosures of substantially similar allegations or transactions in a federal criminal, civil, or administrative hearing in which the government or its agent was a party; or in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or from the news media.  Relator is also an original source of the information alleged in this complaint as defined by 31 U.S.C. § 3730(e)(4)(B).  Additionally, the allegations or transactions alleged in this complaint are not the subject of a civil suit or an administrative civil money penalty proceeding in which the government is already a party.

## STATUTORY AND REGULATORY BACKGROUND

### I.     The Federal False Claims Act

13.     The Federal False Claims Act (FCA) was originally enacted during the Civil War. Congress substantially amended the FCA in 1986—and again in 2009 and 2010—to enhance the ability of the federal government to recover losses sustained as a result of fraud committed against it.  Congress amended the FCA after finding that fraud in federal programs was pervasive and that the FCA, which Congress characterized as the primary tool for combating government fraud, required modernization.  Congress intended the amendments to create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the government's behalf.

14.     In relevant part, the FCA prohibits: (a) knowingly presenting, or causing to be presented, a false or fraudulent claim to the federal government for payment or approval; (b) knowingly making or using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; (c) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the

government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the government; and (d) conspiring to violate these provisions.  31 U.S.C. § 3729(a)(1)(A), (B), (C), (G).

15.    "Knowingly" means that a person, with respect to information, "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  *Id*. § 3729(b)(1)(A).

16.    A record or statement is "material" if it "ha[s] a natural tendency to influence, or [is] capable of influencing, the payment or receipt of money or property."  *Id*. § 3729(b)(4).

17.    Any person who violates the FCA is liable for a civil penalty of up to $23,331 for each violation, plus three times the amount of the damages sustained by the United States.  *See id*. § 3729(a)(1); 85 Fed. Reg. 37,004-10 (June 19, 2020).

18.    The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery.  The FCA requires the Complaint to be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

## II.    The Federal Anti-Kickback Statute

19.    The federal Anti-Kickback Statute (AKS) and analogous State laws prohibit any individual or entity from soliciting, receiving, offering, or paying any remuneration to induce or reward any person for referring, recommending, or arranging for the purchase of any item or service for which payment may be made under a federal health care program.  *See* 42 U.S.C. § 1320a-7b(b).

6

20.     The AKS is designed to ensure that physicians make clinical decisions based upon informed, impartial medical judgment unaffected by bribes or financial self-interest.  In enacting the statute, Congress recognized that the corruption of medical judgment can result in goods or services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.  The AKS also serves as a bulwark against unfair competition, attempting to create a level playing field where the quality of a medical good or service, not a kickback, determines whether a physician prescribes it.

21.     In relevant part, the AKS states:

[W[hoever knowingly and willfully offers or pays remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal healthcare program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal healthcare program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(2).

22.     In 2010, Congress amended the AKS by adding 42 U.S.C. § 1320a-7b(g), which makes clear that claims tainted by AKS violations are false within the meaning of the FCA.  *See also* 155 Cong. Rec. S10854 (daily ed. Dec. 21, 2010) ("[A]ll claims resulting from illegal kickbacks are considered false claims for purposes of civil action under the False Claims Act . . .").

23.     Further, courts almost uniformly hold that the 2010 amendment renders an AKS violation *per se* material to the government's decision to pay a claim under the FCA.  *See, e.g.*, *Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019) ("We . . . read the AKS amendment as obviating the need for a plaintiff to plead materiality. . . . This construction inescapably follows

from the statute's plain language stating that a claim resulting from a violation of the AKS 'constitutes a false or fraudulent claim.'") (citation omitted).

24.   To violate the AKS, "[a] person need not have actual knowledge of [the AKS] or specific intent to commit a violation of [the AKS]." 42 U.S.C. § 1320a-7b(h).  Instead, a defendant acts "knowingly" when they "do something voluntarily" or "deliberately" and acts "willfully" when they "do something purposely that law forbids." *United States ex rel. Banigan v. Organon USA Inc.*, No. CV 07-12153-RWZ, 2016 WL 10704126, at *3 (D. Mass. Aug. 23, 2016) (quoting *United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d 20, 33 (1st Cir. 1989)).

25.   "Remuneration" under the AKS is broadly defined to reach "the transferring of anything of value in any form or manner whatsoever."  Office of the Inspector General (OIG) Anti-Kickback Provisions, 56 Fed. Reg. 35952, 35958 (July 29, 1991).  Offering or paying remuneration to a healthcare provider violates the AKS "so long as one purpose of the offer or payment is to induce Medicare or Medicaid patient referrals." *United States v. Regeneron Pharms., Inc.*, No. CV 20-11217-FDS, 2020 WL 7130004, at *8 (D. Mass. Dec. 4, 2020) (quotation omitted).

26.   The Office of the Inspector General for the Department of Health and Human Services (OIG) has specifically warned pharmaceutical manufacturers that providing free goods to physicians capable of prescribing their drugs may implicate the AKS.  *See* OIG Compliance Program Guidance for Pharmaceutical Mfrs., 68 Fed. Reg. 23731–01, 23737 (May 5, 2003) ("Any time a pharmaceutical manufacturer provides anything of value to a physician who might prescribe the manufacturer's product, the manufacturer should examine whether it is providing a valuable tangible benefit to the physician with the intent to induce or reward

referrals."). The practice is particularly problematic "if goods or services provided by the manufacturer eliminate an expense that the physician would have otherwise incurred (i.e., have independent value to the physician) . . . [and] the arrangement is tied directly or indirectly to the generation of federal health care program business for the manufacturer." *Id*.

### III.    Government Reimbursement for Cataract Surgeries

#### A.  Medicare, Medicaid, and Other Federally Funded Healthcare Programs

27.    Medicare is a federally funded health insurance program administered by CMS benefiting individuals 65 and older, the disabled, and patients with certain underlying medical conditions. *See* 42 U.S.C. § 1395c *et seq*.

28.    Original Medicare consists of Part A and Part B. Part A covers hospital services and skilled nursing facility care, among other things. Part B is medical insurance that covers expenses like doctor appointments, outpatient care and procedures, and certain drugs. Medicare Part D offers prescription drug coverage. Patients with both Medicare Part A and Part B may purchase Medicare Supplement Insurance, or Medigap, to cover costs like copayments and coinsurance.

29.    Medicare Part C, known as Medicare Advantage, consists of insurance plans administered by private companies that contract with the federal government. Medicare Advantage combines the coverage of Part A and Part B under a single insurance plan, and may also include Part D coverage.

30.    Medicaid is a joint federal-state health benefits program generally available to low-income adults and their children, as well as to individuals with certain disabilities. The federal and state governments jointly fund Medicaid. Each state administers its Medicaid

program in accordance with a state plan approved by the Centers for Medicare and Medicaid

Services (CMS).

31.    TRICARE, administered and funded by the U.S. Department of Defense, is a

healthcare program for individuals and dependents affiliated with the armed forces.  *See* 10

U.S.C. § 1071 *et seq.*; 32 C.F.R. § 199.4(a).

32.    Every healthcare provider that participates in either Medicare, Medicaid, or the

TRICARE program certifies their compliance with the AKS as a condition of both participation

and payment.

33.    To submit claims for payment to Medicare, providers submit Medicare

Enrollment Applications in which they certify, among other things,

> I agree to abide by the Medicare laws, regulations and program instructions that
> apply to apply to me or to the organization listed in section 4A of this application.
> . . . I understand that payment of a claim by Medicare is conditioned upon the claim
> and the underlying transaction complying with such laws, regulations, and program
> instructions (including, but not limited to, the Federal Anti-Kickback Statute, 42
> U.S.C. section 1320a-7b(b) (section 1128B(b) of the Social Security Act) and the
> Physician Self-Referral Law (Stark Law), 42 U.S.C. section 1395nn (section 1877
> of the Social Security Act)). . . . I will not knowingly present or cause to be
> presented a false or fraudulent claim for payment by Medicare, and I will not submit
> claims with deliberate ignorance or reckless disregard of their truth or falsity.

Form CMS-855I (for physicians and non-physician practitioners); *see also* Form CMS-855A (for

institutional providers).

34.    Although the Medicaid Provider Application varies from state to state and

TRICARE enrollment agreements vary by administrative region, providers likewise affirm and

undertake compliance with all applicable state and Federal laws.

### B.  Cataract Surgery Payment

35.    Cataract surgery involves the removal of the natural lens of the eye that has

developed an opacification—i.e., a cataract—and its replacement with an artificial lens.

Medicare pays for 75% to 80% of the approximately 4 million cataract surgeries performed each year.  Medicare Part B alone pays for roughly 2 million surgeries annually.

36.     The vast majority of cataract surgeries are performed on an outpatient basis by an ophthalmologist.  About 70% of cataract surgeries occur in ambulatory surgical centers (ASCs) while the remainder are performed in hospital-based outpatient departments (HOPDs).

37.     When cataract surgery is performed on an outpatient basis, Medicare Part B covers the procedure.  Part B typically covers 80% of the cost of the surgery with the patient responsible for the remaining 20%, which may be covered by a Medigap plan.

38.     Medicare reimburses ophthalmologists for cataract surgery using an Ambulatory Payment Classification, which consist of a bundled payment intended to cover the cost of the entire service.  The bundled payment includes payment for the performance of the surgery itself (i.e., the physician's fee), the provision of anesthesia, and a facility fee.  The facility fee covers surgical supplies, which include any drug administered at the time of the cataract procedure.

39.     Following a cataract procedure, patients are prescribed eye-drops to treat inflammation.  Medicare Part D typically covers these eye drops.  However, a drug administered at the time of the cataract surgery, even if intended to treat post-operative inflammation or pain, is not separately payable by Medicare.

### C. Pass-Through Drugs

40.     An exception to this rule exists for so-called "pass-through" drugs.  Section 1833(t)(6) of the Social Security Act allows separate payment by Medicare for a product with pass-through status for at least two years and typically no longer than three years.

41.     The goal of pass-through payments is to encourage the use of newly FDA-approved medical devices, drugs, and biologics by temporarily paying more than established facility fees.  Often, a new drug is expensive, and the relevant facility fee is not large enough to

cover its cost.  By giving a drug pass-through status and ensuring reimbursement for two to three years, providers are more likely to utilize the drug.

42.     Payment by Medicare for pass-through drugs is initially set at wholesale acquisition cost plus 6%, and then at average sales price plus 6%.  Whether and to what extent a commercial insurer will provide reimbursement for pass-through drugs varies.

43.     Patients with Medicare Part B owe no copayment when a pass-through drug is used in a HOPD setting but owe a 20% copayment when the same drug is used in an ASC.  However, most patients with Medicare Part B have supplemental Medigap insurance that covers the copayment.  Patients covered by Part C—i.e., Medicare Advantage—may also have separate coverage for the 20% copayment.

44.     After a drug or device's pass-through status expires, it may be packaged and reimbursed as part of the facility fee for which a hospital or ASC would otherwise receive payment.  This fee, however, does not always cover the cost of the drug or device, discouraging continued use once pass-through status expires.

### D.  DEXYCU® & DEXTENZA®

45.     DEXYCU® and DEXTENZA® are corticosteroids used to treat post-operative inflammation of the eye.  Both drugs are primarily marketed to ophthalmologists for use in conjunction with cataract surgery.  Through different mechanisms, DEXYCU® and DEXTENZA® are placed into the eye at the end of cataract surgery and deliver a tapered dose of corticosteroid.

46.     The drugs are intended to eliminate the need for compliance with a weeks-long, post-operative regimen of prescription steroid eye drops.  While prescription eye drops cost about $60 per bottle, DEXYCU® and DEXTENZA® cost more than $500 per dose.

12

Approximately 6 million steroid prescriptions are written each year in connection with ocular surgeries and DEXYCU® and DEXTENZA® compete head-to-head for sales in this market.

47.     DEXYCU®[1] is produced by EyePoint and was approved by the FDA in February 2018 for the treatment of postoperative inflammation.  DEXYCU® consists of a single dose administered by an ophthalmologist through an intraocular injection at the end of cataract surgery.  EyePoint sells DEXYCU® in part through ImprimisRx, which in turn distributes the product to specialty pharmacies to deliver to ASCs and physicians.

48.     DEXYCU® received transitional pass-through status in October 2018 and EyePoint launched commercial sales of the drug in March 2019.  DEXYCU®'s pass-through status is set to expire at the end of 2022.

49.     DEXYCU® was initially assigned the HCPCS[2] code C9034, a temporary billing code that can be used only for reimbursement by Medicare.  Effective January 1, 2019, DEXYCU® received the permanent code J1095, which may be used to bill all government and third-party insurers nationwide, though not all insurers will provide reimbursement.

50.     DEXTENZA®[3] is owned by Ocular Therapeutix and was approved by the FDA in November 2018 for the treatment of ocular pain following ophthalmic surgery.  In June 2019, the FDA also approved DEXTENZA® for treatment of post-operative inflammation.  DEXTENZA® is an intracanalicular insert placed in the eye at the end of cataract surgery.

51.     DEXTENZA® received pass-through status in 2019 and Ocular Therapeutix launched commercial sales of the drug in the United States in July 2019.  DEXTENZA® was

---

[1] DEXYCU®'s long-form name is dexamethasone intraocular suspension.

[2] HCPCS stands for Healthcare Common Procedure Coding System.  It is the primary coding system used for medical billing.

[3] DEXTENZA®'s long-form name is dexamethasone ophthalmic insert.

initially issued the HCPCS code C9048 effective July 1, 2019, but was granted the code J1096 effective October 1, 2019.  As with DEXYCU®, DEXTENZA®'s pass-through status will expire at the end of 2022.

**DEFENDANT'S KICKBACK SCHEME**

52.    Defendant uses illegal kickbacks to sell DEXYCU® and edge out competition from DEXTENZA®.  Specifically, EyePoint provides physicians with two free samples of DEXYCU® for every one prescription purchased.  This allows physicians to use DEXYCU® in cataract surgeries covered by various payors that do not provide reimbursement for DEXYCU® without paying out of pocket for the drug, thereby subsidizing the cost of the surgery and increasing the ophthalmologists' profits.  The free samples also induce the physicians to continue purchasing DEXYCU® to treat their Medicare, Medicaid, and TRICARE patients and bill government payors.

53.    This scheme is intended to and does induce more prescriptions of DEXYCU® and, consequently, more claims for reimbursement to government-funded healthcare programs.

I.    **Defendant Has Induced Federal Healthcare Business by Giving Physicians Three DEXYCU® Prescriptions for the Price of One**

54.    As a general matter, ophthalmologists prefer to prescribe a single drug to their different patients to treat post-operative inflammation.  This streamlines their billing practices and helps with uniformity of patient outcomes.

55.    However, because not all insurers cover DEXYCU® or DEXTENZA®, ophthalmologists' preference for uniformity disincentivizes them from prescribing the drugs to *any* of their patients, even patients with insurance like Medicare Part B that does provide reimbursement.  EyePoint said as much to its shareholders in 2019, explaining that many ASCs

"are waiting to ensure reimbursement of DEXYCU across multiple insurers before ordering the product in significant volume."[4]

56.     To overcome this reimbursement hurdle and increase sales, EyePoint illegally gives away two free "samples" of DEXYCU® for every single prescription purchased.  This allows ophthalmologists to use DEXYCU® with all their patients, including those with insurance that does not reimburse the drug, without shouldering the cost of the prescription themselves or passing the cost onto patients.  It also induces the physicians to purchase DEXYCU® to prescribe to patients with government-sponsored health plans that provide reimbursement for the drug.

57.     In other words, Defendant provides physicians with goods that have independent value—free DEXYCU®. prescriptions used to subsidize their commercial surgeries—in order to generate federal health care program business.  *See* 68 Fed. Reg. at 23737.  *See also United States ex rel. Wood v. Allergan Inc.*, 246 F. Supp. 3d 772, 807 (S.D.N.Y. 2017) ("Allergan's provision of free drug samples (specifically, eye drop drugs that are administered prior to surgery and thus not reimbursable under Medicare) could plausibly have subsidized surgical costs, increasing ophthalmologists' profit per surgery. [] Such profit maximization can constitute remuneration under the AKS.").

58.     Relator first learned of this "three-for-the-price-of-one" scheme in February 2021 while speaking with surgeons practicing at Barnet Dulaney Perkins Eye Center in Flagstaff, Arizona.  Barnet Dulaney Perkins is part of a network of ASCs located in Arizona, Nevada, New Mexico, and West Texas owned by American Vision Partners (AVP), a private-equity firm. AVP accounts for a significant portion of DEXYCU®'s national sales.

---

[4] EyePoint Pharmaceuticals, Inc. Quarterly Report (Form 10-Q) (Aug. 7, 2019) at 8.

59.     Relator had approached the Barnet Dulaney Perkins surgeons about purchasing DEXTENZA®.  In response, the surgeons asked how DEXTENZA® worked, explaining that when they purchase DEXYCU®, they receive "enough for everyone," i.e., enough prescriptions to cover both commercial and Medicare patients.  Relator, who was with the surgeons in their operating room, saw a white board listing various patients.  Next to two patients, the word "sample" was written next to "DEXYCU®".

60.     The scheme was confirmed in July 2021 when Relator approached Box Canyon Surgery Center in Las Vegas about purchasing DEXTENZA®.  On July 15, 2021, Relator received the following email from Box Canyon's Nurse Administrator:  "Going forward how does DEXTENZA® work.  **Is it the same model as DEXYCU® where we get 2 samples for every one purchased to use on the insurances that don't cover?**" (emphasis added).  Relator explained that Ocular Therapeutix did not operate on the DEXYCU® "model."

61.     EyePoint's scheme is not limited to the Southwest.  Relator recently spoke with an Ocular Therapeutix employee who sells DEXTENZA® in Indiana.  In attempting to sell DEXTENZA® to surgeons at the Ohio Valley Eye Institute in Evansville, Indiana, the employee, like Relator, was told by an ophthalmologist that EyePoint provides physicians with two free "samples" of DEXYCU® for every single prescription purchased.

62.     EyePoint employs approximately ten key account managers selling DEXYCU® nationwide, supplemented by at least ten sales representatives from ImprimisRx.  EyePoint's DEXYCU® salesforce is "supported by [EyePoint's] market access, marketing and commercial sales management teams."[5]  In other words, Relator has reason to believe that EyePoint's free sample scheme is not confined to a few "rogue" salespeople, but is instead occurring nationwide.

---

[5] EyePoint Pharmaceuticals, Inc. Annual Report (Form 10-K) (Mar. 12, 2021) at 11.

## II.    Defendant Has Acted Knowingly and Willfully

63.    EyePoint is well aware that its free sample scheme may run afoul of the AKS.

Since launching DEXYCU® in 2019, EyePoint has included a version of the following statement

in its annual report:

> The federal Anti-Kickback Statute prohibits, among other things, knowingly and willfully offering, paying, soliciting or receiving remuneration, directly or indirectly, in cash or in kind, to induce or in return for purchasing, leasing, ordering or arranging for or recommending the purchase, lease or order of any healthcare item or service reimbursable, in whole or in part, under Medicare, Medicaid or other federally financed healthcare programs. **This statute has been interpreted to apply to arrangements between pharmaceutical manufacturers on one hand and prescribers, purchasers, and formulary managers on the other. A violation of the Anti-Kickback Statute may be established without proving actual knowledge of the statute or specific intent to violate it. The government may assert that a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the federal civil False Claims Act.** Although there are a number of statutory exceptions and regulatory safe harbors protecting certain common activities from prosecution, the exceptions and safe harbors are drawn narrowly and practices that involve remuneration to those who prescribe, purchase, or recommend pharmaceuticals, including certain discounts, or engaging such individuals as consultants, speakers or advisors, may be subject to scrutiny if they do not fit squarely within the exception or safe harbor. . . . **Our practices may not in all cases meet all of the criteria for safe harbor protection from anti-kickback liability.** Moreover, there are no safe harbors for many common practices, such as educational and research grants, charitable donations, product support and patient assistance programs. Arrangements that implicate the Anti-Kickback Statute and do not fit within an exception or safe harbor are reviewed on a case-by-case basis to determine whether, based on the facts and circumstances, they violate the statute. . . .
>
> **In recent years, several pharmaceutical and other healthcare companies have faced enforcement actions under the False Claims Act for, among other things**, **providing free product to customers with the expectation that the customers would bill federal programs for the product**, and other interactions with prescribers and other customers including interactions that may have affected customers' billing or coding practices on claims submitted to the federal government. . . .[6]

---

[6] EyePoint Pharmaceuticals, Inc. Annual Report (Form 10-K) (Mar. 12, 2021) at 27-28.

17

64.     Despite this knowledge, EyePoint has deliberately chosen to flout the AKS to increase sales by providing free samples to doctors.

### III.     Defendant Has Caused the Submission of False Claims Through Its Illegal Practices

65.     As discussed above, claims that are tainted by illegal kickbacks and then submitted for payment to federally funded health care programs are *per se* false under the FCA. 42 U.S.C. § 1320a-7b(g).  Moreover, the FCA imposes liability not only on those who submit false claims, but also on those who cause others to submit false claims.  31 U.S.C. § 3729(a)(1)(B); *See, e.g.*, *United States ex rel. Arnstein v. TEVA Pharm. USA, Inc.*, No. 13 CIV. 3702, 2016 WL 750720, at *23-24 (S.D.N.Y. Feb. 22, 2016) ("It is well established that the FCA reaches claims that are rendered false by one party, but submitted to the government by another.").

66.      Each time a provider who has received three doses of DEXYCU® for the price of one submits a claim for reimbursement to Medicare or Medicaid for DEXYCU®, that claim is tainted by an illegal kickback.  It is irrelevant whether the physician actually paid for the particular DEXYCU® prescription for which the physician seeks reimbursement; EyePoint provides the "free samples" precisely to induce the provider to purchase the DEXCYU® doses that are billed to Medicare, Medicaid, TRICARE, or any other government program.

67.     Moreover, providers submit claims for payment to Medicare, Medicaid, and TRICARE typically using either Form CMS-1500 or Form CMS-1450.  In submitting either form, a provider certifies that the claim is accurate and complies with relevant federal and state laws.  Providers make an expressly false certification every time they submit a claim for reimbursement for a DEXYCU® prescription that is tainted by EyePoint's kickbacks.

IV.    **Defendant's Fraudulent Conduct Was Material to Medicare and Medicaid Payment Decisions**

68.    Compliance with the AKS is material to CMS's decision to pay a Medicare claim. *See, e.g.*, *Guilfoile*, 913 F.3d at 190.  The federal government, which also funds the Medicaid program and TRICARE, would not have paid for claims submitted for DEXCYU® if it had known those claims were tainted by illegal kickbacks.  Nor would the various States have paid claims for DEXCYU® if they had known those claims were tainted by illegal kickbacks.

69.    The federal government regularly uses the FCA to hold defendants accountable for submitting or causing the submission of claims tainted by illegal kickbacks, particularly where pharmaceutical companies bribe prescribing physicians to induce prescriptions of their drugs.  *See, e.g.*, Press Release, Dep't of Justice, Novartis Pays Over $642 Million to Settle Allegations of Improper Payments to Patients and Physicians (July 1, 2020).

## CAUSES OF ACTION

### COUNT I
### Federal False Claims Act
### 31 U.S.C. §§ 3729(a)(1)(A), (B)

70.    Relator alleges and incorporates by reference the allegations made in Paragraphs 1 through 69 of this Complaint.

71.    This is a claim for treble damages and penalties under the federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

72.    By virtue of the acts described above, Defendant, its agents, and employees knowingly have presented, or caused to be presented, false or fraudulent claims for payment to the United States in violation of 31 U.S.C. § 3729(a)(1)(A).  Each of these requests for payment constitutes an actionable false claim under the False Claims Act.

73. By virtue of the acts described above, Defendant, its agents, and employees knowingly have made or used, or caused to be made or used, false records or statements to get the United States to pay or approve false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

74. The United States, unaware of the falsity of the records, statements, or claims that Defendant made or caused to be made, paid, and continues to pay, the claims that would not be paid but for Defendant's illegal conduct.

75. By reason of these payments, Defendant has damaged, and continues to damage, the United States a substantial amount to be determined at trial.  In addition, the United States is entitled to penalties for each and every false or fraudulent claim made or caused to be made by Defendant.

**COUNT II**
**California False Claims Act**
Cal. Gov't Code § 12650 *et seq*.

76. Relator alleges and incorporates by reference the allegations made in Paragraphs 1 through 75 of this Complaint.

77. This is a civil action brought by Relator on, behalf of the State of California, against Defendant under the California False Claims Act, Cal. Gov't Code § 12652(c).

78. By virtue of the acts described above, Defendant, its agents, and employees knowingly have presented, or caused to be presented, false or fraudulent claims for payment to the State of California in violation of Cal. Gov't Code § 12651(a)(1).  Each of these requests for payment constitutes an actionable false claim under the California False Claims Act.

79. By virtue of the acts described above, Defendant, its agents, and employees knowingly have made or used, or caused to be made or used, false records or statements to get

the State of California to pay or approve false or fraudulent claims, in violation of Cal. Gov't Code § 12651(a)(2).

80.    The State of California, unaware of the falsity of the records, statements, or claims that Defendant made or caused to be made, paid, and continues to pay, the claims that would not be paid but for Defendant's illegal conduct.

81.    By reason of these payments, Defendant has damaged, and continues to damage, the State of California a substantial amount to be determined at trial.  In addition, the State of California is entitled to penalties for each and every false or fraudulent claim made or caused to be made by Defendant.

**COUNT III**
**Colorado Medicaid False Claims Act**
Colo. Rev. Stat. § 25.5-4-304 *et seq.*

82.    Relator alleges and incorporates by reference the allegations made in Paragraphs 1 through 81 of this Complaint.

83.    This is a civil action brought by Relator on behalf of the State of Colorado against Defendant under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-306(2).

84.    By virtue of the acts described above, Defendant, its agents, and employees knowingly have presented, or caused to be presented, false or fraudulent claims for payment to the State of Colorado in violation of Colo. Rev. Stat. § 25.5-4-305(a).  Each of these requests for payment constitutes an actionable false claim under the Colorado Medicaid False Claims Act.

85.    By virtue of the acts described above, Defendant, its agents, and employees knowingly have made or used, or caused to be made or used, false records or statements to get the State of Colorado to pay or approve false or fraudulent claims, in violation of Colo. Rev. Stat. § 25.5-4-305(b).

86.     The State of Colorado, unaware of the falsity of the records, statements, or claims that Defendant made or caused to be made, paid, and continues to pay, the claims that would not be paid but for Defendant's illegal conduct.

87.     By reason of these payments, Defendant has damaged, and continues to damage, the State of Colorado a substantial amount to be determined at trial.  In addition, the State of Colorado is entitled to penalties for each and every false or fraudulent claim made or caused to be made by Defendant.

**COUNT IV**
**Connecticut False Claims Act**
Conn. Gen. Stat. § 4-274 *et seq.*

88.     Relator alleges and incorporates by reference the allegations made in Paragraphs 1 through 87 of this Complaint.

89.     This is a civil action brought by Relator on behalf of the State of Connecticut against Defendant under the Connecticut False Claims Act, Conn. Gen. Stat. § 4-277(a).

90.     By virtue of the acts described above, Defendant, its agents, and employees knowingly have presented, or caused to be presented, false or fraudulent claims for payment to the State of Connecticut in violation of Conn. Gen. Stat. § 4-275(a)(1).  Each of these requests for payment constitutes an actionable false claim under the Connecticut False Claims Act.

91.     By virtue of the acts described above, Defendant, its agents, and employees knowingly have made or used, or caused to be made or used, false records or statements to get the State of Connecticut to pay or approve false or fraudulent claims, in violation of Conn. Gen. Stat. § 4-275(a)(2).

92.     The State of Connecticut, unaware of the falsity of the records, statements, or claims that Defendant made or caused to be made, paid, and continues to pay, the claims that would not be paid but for Defendant's illegal conduct.

93.     By reason of these payments, Defendant has damaged, and continues to damage, the State of Connecticut a substantial amount to be determined at trial. In addition, the State of Connecticut is entitled to penalties for each and every false or fraudulent claim made or caused to be made by Defendant.

**COUNT V**
**District of Columbia False Claims Act**
D.C. Code § 2-381.01 *et seq.*

94.     Relator alleges and incorporates by reference the allegations made in Paragraphs 1 through 93 of this Complaint.

95.     This is a civil action brought by Relator on behalf of the District of Columbia against Defendant under the District of Columbia False Claims Act, D.C. Code § 2-381.03(b).

96.     By virtue of the acts described above, Defendant, its agents, and employees knowingly have presented, or caused to be presented, false or fraudulent claims for payment to the District of Columbia in violation of D.C. Code § 2-381.02(a)(1). Each of these requests for payment constitutes an actionable false claim under the District of Columbia False Claims Act.

97.     By virtue of the acts described above, Defendant, its agents, and employees knowingly have made or used, or caused to be made or used, false records or statements to get the District of Columbia to pay or approve false or fraudulent claims, in violation of D.C. Code § 2-381.02(a)(2).

98.     The District of Columbia, unaware of the falsity of the records, statements, or claims that Defendant made or caused to be made, paid, and continues to pay, the claims that would not be paid but for Defendant's illegal conduct.

99.     By reason of these payments, Defendant has damaged, and continues to damage, the District of Columbia a substantial amount to be determined at trial. In addition, the District

23

of Columbia is entitled to penalties for each and every false or fraudulent claim made or caused to be made by Defendant.

**COUNT VI**
**Florida False Claims Act**
Fla. Stat. § 68.081 *et seq.*

100.   Relator alleges and incorporates by reference the allegations made in Paragraphs 1 through 99 of this Complaint.

101.   This is a civil action brought by Relator on behalf of the State of Florida against Defendant under the Florida False Claims Act, Fla. Stat. § 68.083(2).

102.   By virtue of the acts described above, Defendant, its agents, and employees knowingly have presented, or caused to be presented, false or fraudulent claims for payment to the State of Florida in violation of Fla. Stat. § 68.082(2)(a).  Each of these requests for payment constitutes an actionable false claim under the Florida False Claims Act.

103.   By virtue of the acts described above, Defendant, its agents, and employees knowingly have made or used, or caused to be made or used, false records or statements to get the State of Florida to pay or approve false or fraudulent claims, in violation of Fla. Stat. § 68.082(2)(b).

104.   The State of Florida, unaware of the falsity of the records, statements, or claims that Defendant made or caused to be made, paid, and continues to pay, the claims that would not be paid but for Defendant's illegal conduct.

105.   By reason of these payments, Defendant has damaged, and continues to damage, the State of Florida a substantial amount to be determined at trial.  In addition, the State of Florida is entitled to penalties for each and every false or fraudulent claim made or caused to be made by Defendant.

24

**COUNT VII**
**Georgia Taxpayer Protection Against False Claims Act**
Ga. Code Ann. § 23-3-120 *et seq.*

106.   Relator alleges and incorporates by reference the allegations made in Paragraphs 1 through 105 of this Complaint.

107.   This is a civil action brought by Relator on behalf of the State of Georgia against Defendant under the Georgia Taxpayer Protection Against False Claims Act, Ga. Code Ann. § 23-3-122(b).

108.   By virtue of the acts described above, Defendant, its agents, and employees knowingly have presented, or caused to be presented, false or fraudulent claims for payment to the State of Georgia in violation of Ga. Code Ann. § 23-3-121(a)(1).  Each of these requests for payment constitutes an actionable false claim under the Georgia False Medicaid Claims Act.

109.   By virtue of the acts described above, Defendant, its agents, and employees knowingly have made or used, or caused to be made or used, false records or statements to get the State of Georgia to pay or approve false or fraudulent claims, in violation of Ga. Code Ann. § 23-3-121(a)(2).

110.   The State of Georgia, unaware of the falsity of the records, statements, or claims that Defendant made or caused to be made, paid, and continues to pay, the claims that would not be paid but for Defendant's illegal conduct.

111.   By reason of these payments, Defendant has damaged, and continues to damage, the State of Georgia a substantial amount to be determined at trial.  In addition, the State of Georgia is entitled to penalties for each and every false or fraudulent claim made or caused to be made by Defendant.

**COUNT VIII**
**Illinois False Claims Whistleblower Reward and Protection Act**
740 Ill. Comp. Stat. § 175/1 *et seq.*

112.    Relator alleges and incorporates by reference the allegations made in Paragraphs 1 through 111 of this Complaint.

113.    This is a civil action brought by Relator on behalf of the State of Illinois against Defendant under the Illinois False Claims Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/4(b).

114.    By virtue of the acts described above, Defendant, its agents, and employees knowingly have presented, or caused to be presented, false or fraudulent claims for payment to the State of Illinois in violation of 740 Ill. Comp. Stat. § 175/3(a)(1)(A).  Each of these requests for payment constitutes an actionable false claim under the Illinois False Claims Whistleblower Reward and Protection Act.

115.    By virtue of the acts described above, Defendant, its agents, and employees knowingly have made or used, or caused to be made or used, false records or statements to get the State of Illinois to pay or approve false or fraudulent claims, in violation of 740 Ill. Comp. Stat. § 175/3(a)(1)(B).

116.    The State of Illinois, unaware of the falsity of the records, statements, or claims that Defendant made or caused to be made, paid, and continues to pay, the claims that would not be paid but for Defendant's illegal conduct.

117.    By reason of these payments, Defendant has damaged, and continues to damage, the State of Illinois a substantial amount to be determined at trial.  In addition, the State of Illinois is entitled to penalties for each and every false or fraudulent claim made or caused to be made by Defendant.

## COUNT IX
### Indiana False Claims and Whistleblower Protection Act
Ind. Code § 5-11-5.5 *et seq.*

118.    Relator alleges and incorporates by reference the allegations made in Paragraphs 1 through 117 of this Complaint.

119.    This is a civil action brought by Relator on behalf of the State of Indiana against Defendant under the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-4(a).

120.    By virtue of the acts described above, Defendant, its agents, and employees knowingly have presented, or caused to be presented, false or fraudulent claims for payment to the State of Indiana in violation of Ind. Code § 5-11-5.5-2(b)(1).  Each of these requests for payment constitutes an actionable false claim under the Indiana False Claims and Whistleblower Protection Act.

121.    By virtue of the acts described above, Defendant, its agents, and employees knowingly have made or used, or caused to be made or used, false records or statements to get the State of Indiana to pay or approve false or fraudulent claims, in violation of Ind. Code § 5-11-5.5-2(b)(1).

122.    The State of Indiana, unaware of the falsity of the records, statements, or claims that Defendant made or caused to be made, paid, and continues to pay, the claims that would not be paid but for Defendant's illegal conduct.

123.    By reason of these payments, Defendant has damaged, and continues to damage, the State of Indiana a substantial amount to be determined at trial.  In addition, the State of Indiana is entitled to penalties for each and every false or fraudulent claim made or caused to be made by Defendant.

**COUNT X**
**Maryland False Health Claims Act**
Md. Code Ann. Health-Gen. § 2-601 *et seq*.

124. Relator alleges and incorporates by reference the allegations made in Paragraphs 1 through 123 of this Complaint.

125. This is a civil action brought by Relator on behalf of the State of Maryland against Defendant under the Maryland False Health Claims Act, Md. Code Ann. Health-Gen. § 2-604(a).

126. By virtue of the acts described above, Defendant, its agents, and employees knowingly have presented, or caused to be presented, false or fraudulent claims for payment to the State of Maryland in violation of Md. Code Ann. Health-Gen. § 2-602(a)(1).  Each of these requests for payment constitutes an actionable false claim under the Maryland False Health Claims Act.

127. By virtue of the acts described above, Defendant, its agents, and employees knowingly have made or used, or caused to be made or used, false records or statements to get the State of Maryland to pay or approve false or fraudulent claims, in violation of Md. Code Ann. Health-Gen. § 2-602(a)(2).

128. The State of Maryland, unaware of the falsity of the records, statements, or claims that Defendant made or caused to be made, paid, and continues to pay, the claims that would not be paid but for Defendant's illegal conduct.

129. By reason of these payments, Defendant has damaged, and continues to damage, the State of Maryland a substantial amount to be determined at trial.  In addition, the State of Maryland is entitled to penalties for each and every false or fraudulent claim made or caused to be made by Defendant.

**COUNT XI**
**Massachusetts False Claims Act**
Mass. Gen. Laws ch. 12, § 5A *et seq.*

130.    Relator alleges and incorporates by reference the allegations made in Paragraphs 1 through 129 of this Complaint.

131.    This is a civil action brought by Relator on behalf of the Commonwealth of Massachusetts against Defendant under the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, § 5C(2).

132.    By virtue of the acts described above, Defendant, its agents, and employees knowingly have presented, or caused to be presented, false or fraudulent claims for payment to the Commonwealth of Massachusetts in violation of Mass. Gen. Laws ch. 12, § 5B(1).  Each of these requests for payment constitutes an actionable false claim under the Massachusetts False Claims Act.

133.    By virtue of the acts described above, Defendant, its agents, and employees knowingly have made or used, or caused to be made or used, false records or statements to get the Commonwealth of Massachusetts to pay or approve false or fraudulent claims, in violation of Mass. Gen. Laws ch. 12, § 5B(2).

134.    The Commonwealth of Massachusetts, unaware of the falsity of the records, statements, or claims that Defendant made or caused to be made, paid, and continues to pay, the claims that would not be paid but for Defendant's illegal conduct.

135.    By reason of these payments, Defendant has damaged, and continues to damage, the Commonwealth of Massachusetts a substantial amount to be determined at trial.  In addition, the Commonwealth of Massachusetts is entitled to penalties for each and every false or fraudulent claim made or caused to be made by Defendant

## COUNT XII
**Michigan Medicaid False Claims Act**
Mich. Comp. Laws § 400.601 *et seq.*

136. Relator alleges and incorporates by reference the allegations made in Paragraphs 1 through 135 of this Complaint.

137. This is a civil action brought by Relator on behalf of the State of Michigan against Defendant under the Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.610a(1).

138. By virtue of the acts described above, Defendant, its agents, and employees knowingly have presented, or caused to be presented, false or fraudulent claims for payment to the State of Michigan in violation of Mich. Comp. Laws § 400.603(1). Each of these requests for payment constitutes an actionable false claim under the Michigan Medicaid False Claims Act.

139. By virtue of the acts described above, Defendant, its agents, and employees knowingly have made or used, or caused to be made or used, false records or statements to get the Michigan to pay or approve false or fraudulent claims, in violation of Mich. Comp. Laws § 400.603(2).

140. The State of Michigan, unaware of the falsity of the records, statements, or claims that Defendant made or caused to be made, paid, and continues to pay, the claims that would not be paid but for Defendant's illegal conduct.

141. By reason of these payments, Defendant has damaged, and continues to damage, the State of Michigan a substantial amount to be determined at trial. In addition, the State of Michigan is entitled to penalties for each and every false or fraudulent claim made or caused to be made by Defendant.

## COUNT XIII
### Nevada False Claims Act
Nev. Rev. Stat. § 357.010 *et seq.*

142. Relator alleges and incorporates by reference the allegations made in Paragraphs 1 through 141 of this Complaint.

143. This is a civil action brought by Relator on behalf of the State of Nevada against Defendant under the Nevada False Claims Act, Nev. Rev. Stat. § 357.080(1).

144. By virtue of the acts described above, Defendant, its agents, and employees knowingly have presented, or caused to be presented, false or fraudulent claims for payment to the State of Nevada in violation of Nev. Rev. Stat. § 357.040(1)(a). Each of these requests for payment constitutes an actionable false claim under the Nevada False Claims Act.

145. By virtue of the acts described above, Defendant, its agents, and employees knowingly have made or used, or caused to be made or used, false records or statements to get the State of Nevada to pay or approve false or fraudulent claims, in violation of Nev. Rev. Stat. § 357.040(1)(b).

146. The State of Nevada, unaware of the falsity of the records, statements, or claims that Defendant made or caused to be made, paid, and continues to pay, the claims that would not be paid but for Defendant's illegal conduct.

147. By reason of these payments, Defendant has damaged, and continues to damage, the State of Nevada a substantial amount to be determined at trial. In addition, the State of Nevada is entitled to penalties for each and every false or fraudulent claim made or caused to be made by Defendant.

**COUNT XIV**
**New Jersey False Claims Act**
N.J. Stat. Ann. § 2A:32C-1 *et seq.*

148.    Relator alleges and incorporates by reference the allegations made in Paragraphs 1 through 147 of this Complaint.

149.    This is a civil action brought by Relator on behalf of the State of New Jersey against Defendant under the New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-5(b).

150.    By virtue of the acts described above, Defendant, its agents, and employees knowingly have presented, or caused to be presented, false or fraudulent claims for payment to the State of New Jersey in violation of N.J. Stat. Ann. § 2A:32C-3(a).  Each of these requests for payment constitutes an actionable false claim under the New Jersey False Claims Act.

151.    By virtue of the acts described above, Defendant, its agents, and employees knowingly have made or used, or caused to be made or used, false records or statements to get the State of New Jersey to pay or approve false or fraudulent claims, in violation of N.J. Stat. Ann. § 2A:32C-3(b).

152.    The State of New Jersey, unaware of the falsity of the records, statements, or claims that Defendant made or caused to be made, paid, and continues to pay, the claims that would not be paid but for Defendant's illegal conduct.

153.    By reason of these payments, Defendant has damaged, and continues to damage, the State of New Jersey a substantial amount to be determined at trial.  In addition, the State of New Jersey is entitled to penalties for each and every false or fraudulent claim made or caused to be made by Defendant.

**COUNT XV**
**New Mexico Medicaid False Claims Act**
N.M. Stat. Ann. § 27-14-1 *et seq.*

154.    Relator alleges and incorporates by reference the allegations made in Paragraphs 1 through 153 of this Complaint.

155.    This is a civil action brought by Relator on behalf of the State of New Mexico against Defendant under the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-7(B).

156.    By virtue of the acts described above, Defendant, its agents, and employees knowingly have presented, or caused to be presented, false or fraudulent claims for payment to the State of New Mexico in violation of N.M. Stat. Ann. § 27-14-4(A).  Each of these requests for payment constitutes an actionable false claim under the New Mexico Medicaid False Claims Act.

157.    By virtue of the acts described above, Defendant, its agents, and employees knowingly have made or used, or caused to be made or used, false records or statements to get the State of New Mexico to pay or approve false or fraudulent claims, in violation of N.M. Stat. Ann. § 27-14-4(C).

158.    The State of New Mexico, unaware of the falsity of the records, statements, or claims that Defendant made or caused to be made, paid, and continues to pay, the claims that would not be paid but for Defendant's illegal conduct.

159.    By reason of these payments, Defendant has damaged, and continues to damage, the State of New Mexico a substantial amount to be determined at trial.  In addition, the State of New Mexico is entitled to penalties for each and every false or fraudulent claim made or caused to be made by Defendant.

## COUNT XVI
## New York False Claims Act
N.Y. State Fin. Law § 187 *et seq.*

160.    Relator alleges and incorporates by reference the allegations made in Paragraphs 1 through 159 of this Complaint.

161.    This is a civil action brought by Relator on behalf of the State of New York against Defendant under the New York False Claims Act, N.Y. State Fin. Law § 190(2).

162.    By virtue of the acts described above, Defendant, its agents, and employees knowingly have presented, or caused to be presented, false or fraudulent claims for payment to the State of New York in violation of N.Y. State Fin. Law § 189(1)(a).  Each of these requests for payment constitutes an actionable false claim under the New York False Claims Act.

163.    By virtue of the acts described above, Defendant, its agents, and employees knowingly have made or used, or caused to be made or used, false records or statements to get the State of New York to pay or approve false or fraudulent claims, in violation of N.Y. State Fin. Law § 189(1)(b).

164.    The State of New York, unaware of the falsity of the records, statements, or claims that Defendant made or caused to be made, paid, and continues to pay, the claims that would not be paid but for Defendant's illegal conduct.

165.    By reason of these payments, Defendant has damaged, and continues to damage, the State of New York a substantial amount to be determined at trial.  In addition, the State of New York is entitled to penalties for each and every false or fraudulent claim made or caused to be made by Defendant.

## COUNT XVII
## North Carolina False Claims Act
N.C. Gen. Stat. § 1-605 *et seq.*

166.    Relator alleges and incorporates by reference the allegations made in Paragraphs 1 through 165 of this Complaint.

167.    This is a civil action brought by Relator on behalf of the State of North Carolina against Defendant under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-608(b).

168.    By virtue of the acts described above, Defendant, its agents, and employees knowingly have presented, or caused to be presented, false or fraudulent claims for payment to the State of North Carolina in violation of N.C. Gen. Stat. § 1-608(a)(1).  Each of these requests for payment constitutes an actionable false claim under the North Carolina False Claims Act.

169.    By virtue of the acts described above, Defendant, its agents, and employees knowingly have made or used, or caused to be made or used, false records or statements to get the State of North Carolina to pay or approve false or fraudulent claims, in violation of N.C. Gen. Stat. § 1-608(a)(2).

170.    The State of North Carolina, unaware of the falsity of the records, statements, or claims that Defendant made or caused to be made, paid, and continues to pay, the claims that would not be paid but for Defendant's illegal conduct.

171.    By reason of these payments, Defendant has damaged, and continues to damage, the State of North Carolina a substantial amount to be determined at trial.  In addition, the State of North Carolina is entitled to penalties for each and every false or fraudulent claim made or caused to be made by Defendant.

**COUNT XVIII**
**Tennessee Medicaid False Claims Act**
Tenn. Code Ann. § 71-5-181 *et seq.*

172.    Relator alleges and incorporates by reference the allegations made in Paragraphs 1 through 171 of this Complaint.

173.    This is a civil action brought by Relator on behalf of the State of Tennessee against Defendant under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-183(b).

174.    By virtue of the acts described above, Defendant, its agents, and employees knowingly have presented, or caused to be presented, false or fraudulent claims for payment to the State of Tennessee in violation of Tenn. Code Ann. § 71-5-182(a)(1)(A).  Each of these requests for payment constitutes an actionable false claim under the Tennessee Medicaid False Claims Act.

175.    By virtue of the acts described above, Defendant, its agents, and employees knowingly have made or used, or caused to be made or used, false records or statements to get the State of Tennessee to pay or approve false or fraudulent claims, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(B).

176.    The State of Tennessee, unaware of the falsity of the records, statements, or claims that Defendant made or caused to be made, paid, and continues to pay, the claims that would not be paid but for Defendant's illegal conduct.

177.    By reason of these payments, Defendant has damaged, and continues to damage, the State of Tennessee a substantial amount to be determined at trial.  In addition, the State of Tennessee is entitled to penalties for each and every false or fraudulent claim made or caused to be made by Defendant.

## COUNT XIX
### Texas Medicaid Fraud Prevention Act
Tex. Hum. Res. Code Ann. § 36.001 *et seq*.

178.    Relator alleges and incorporates by reference the allegations made in Paragraphs 1 through 177 of this Complaint.

179.    This is a civil action brought by Relator on behalf of the State of Texas against Defendant under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.101(a).

180.    By virtue of the acts described above, Defendant, its agents, and employees knowingly have presented, or caused to be presented, false or fraudulent claims for payment to the State of Texas in violation of Tex. Hum. Res. Code Ann. § 36.002(1).  Each of these requests for payment constitutes an actionable false claim under the Texas Medicaid Fraud Prevention Act.

181.    By virtue of the acts described above, Defendant, its agents, and employees knowingly have made or used, or caused to be made or used, false records or statements to get the State of Texas to pay or approve false or fraudulent claims, in violation of Tex. Hum. Res. Code Ann. § 36.002(2).

182.    The State of Texas, unaware of the falsity of the records, statements, or claims that Defendant made or caused to be made, paid, and continues to pay, the claims that would not be paid but for Defendant's illegal conduct.

183.    By reason of these payments, Defendant has damaged, and continues to damage, the State of Texas a substantial amount to be determined at trial.  In addition, the State of Texas is entitled to penalties for each and every false or fraudulent claim made or caused to be made by Defendant.

37

## COUNT XX
**Virginia Fraud Against Taxpayers Act**
Va. Code Ann. § 8.01-216.1 *et seq*.

184.    Relator alleges and incorporates by reference the allegations made in Paragraphs 1 through 183 of this Complaint.

185.    This is a civil action brought by Relator on behalf of the Commonwealth of Virginia against Defendant under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.3(A)(2).

186.    By virtue of the acts described above, Defendant, its agents, and employees knowingly have presented, or caused to be presented, false or fraudulent claims for payment to Commonwealth of Virginia in violation of Va. Code Ann. § 8.01-216.3(A)(2). Each of these requests for payment constitutes an actionable false claim under the Virginia Fraud Against Taxpayers Act.

187.    By virtue of the acts described above, Defendant, its agents, and employees knowingly have made or used, or caused to be made or used, false records or statements to get the Commonwealth of Virginia to pay or approve false or fraudulent claims, in violation of Va. Code Ann. § 8.01-216.3(A)(7).

188.    The Commonwealth of Virginia, unaware of the falsity of the records, statements, or claims that Defendant made or caused to be made, paid, and continues to pay, the claims that would not be paid but for Defendant's illegal conduct.

189.    By reason of these payments, Defendant has damaged, and continues to damage, the Commonwealth of Virginia a substantial amount to be determined at trial. In addition, the Commonwealth of Virginia is entitled to penalties for each and every false or fraudulent claim made or caused to be made by Defendant.

**PRAYER FOR RELIEF**

WHEREFORE, Relator prays for judgment against Defendant as follows:

190.    That Defendant ceases and desists from violating 31 U.S.C. § 3729 *et seq.*; Cal. Gov't Code § 12650 *et seq.*; Colo. Rev. Stat. § 25.5-4-304 *et seq.*; Conn. Gen. Stat. § 4-274 *et seq.*; D.C. Code § 2-381.01 *et seq.*; Fla. Stat. § 68.081 *et seq.*; Ga. Code Ann. § 23-3-120 *et seq.*; 740 Ill. Comp. Stat. § 175/1 *et seq.*; Ind. Code § 5-11-5.5 *et seq.*; Md. Code Ann. Health-Gen. § 2-601 *et seq.*; Mass. Gen. Laws ch. 12, § 5A *et seq.*; Mich. Comp. Laws § 400.601 *et seq.*; Nev. Rev. Stat. § 357.010 *et seq.*; N.J. Stat. Ann. § 2A:32C-1 *et seq.*; N.M. Stat. Ann. § 27-14-1 *et seq.*; N.Y. State Fin. Law § 187 *et seq.*; N.C. Gen. Stat. § 1-605 *et seq.*; Tenn. Code Ann. § 71-5-181 *et seq.*; Tex. Hum. Res. Code Ann. § 36.001 *et seq.*; and Va. Code Ann. § 8.01-216.1 *et seq.*

191.    That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained as a result of Defendant's actions, as well as civil penalties against Defendant for each violation of the federal False Claims Act;

192.    That this Court enter judgement against Defendant in an amount equal to three times the amount of damages the States of California, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Maryland, Michigan, Nevada, New Jersey, New Mexico, New York, North Carolina, Tennessee, Texas, the Commonwealths of Massachusetts and Virginia, and the District of Columbia have sustained because of Defendant's actions, plus the maximum civil penalty permitted for each violation of the California False Claims Act; the Colorado Medicaid False Claims Act; the Connecticut False Claims Act; the District of Columbia False Claims Act; the Florida False Claims Act; the Georgia Taxpayer Protection Against False Claims Act; the Illinois False Claims Whistleblower Reward and Protection Act; the Indiana False Claims and Whistleblower Protection Act; The Maryland False Health Claims Act; the Massachusetts False

Claims Act; the Michigan Medicaid False Claims Act; the Nevada False Claims Act; the New Jersey False Claims Act; the New Mexico Medicaid False Claims Act; the New York False Claims Act; the North Carolina False Claims Act; the Tennessee Medicaid False Claims Act; the Texas Medicaid Fraud Prevention Act; and the Virginia Fraud Against Taxpayers Act.

193.    That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the Federal False Claims Act and the relevant sections of the California False Claims Act; the Colorado Medicaid False Claims Act; the Connecticut False Claims Act; the District of Columbia False Claims Act; the Florida False Claims Act; the Georgia Taxpayer Protection Against False Claims Act; the Illinois False Claims Whistleblower Reward and Protection Act; the Indiana False Claims and Whistleblower Protection Act; The Maryland False Health Claims Act; the Massachusetts False Claims Act; the Michigan Medicaid False Claims Act; the Nevada False Claims Act; the New Jersey False Claims Act; the New Mexico Medicaid False Claims Act; the New York False Claims Act; the North Carolina False Claims Act; the Tennessee Medicaid False Claims Act; the Texas Medicaid Fraud Prevention Act; and the Virginia Fraud Against Taxpayers Act; and

194.    That Relator be awarded all fees, costs, and expenses incurred in connection with this action, including attorney's fees, costs, and expenses;

195.    That the United States, the various States, and Relator receive all such other relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands trial by jury.

December 17, 2021

CONSTANTINE CANNON LLP

_____

Edward A. Baker (Mass. Bar No. 651171)
ebaker@constantinecannon.com
Max Voldman (DC Bar No. 1030125)
mvoldman@constantinecannon.com
CONSTANTINE CANNON LLP
1001 Pennsylvania Avenue, N.W.
Suite 1300
Washington, D.C. 20004
Phone: (202) 204-3500
Fax:     (202) 204-3501


Marlene Koury (NY Bar No. 4423471)
mkoury@constantinecannon.com
Leah Judge (CA Bar No. 302406)
ljudge@constantinecannon.com
CONSTANTINE CANNON LLP
150 California Street, Suite 1600
San Francisco, CA  94111
Phone: (415) 639-4001
Fax:     (415) 639-4002


Noah Brecker-Redd (NY Admission Pending)
nbrecker-redd@constantinecannon.com
CONSTANTINE CANNON LLP
335 Madison Avenue, 9th Floor
New York, NY 10017
Phone: (212) 350-2700
Fax:     (212) 350-2701

Attorneys for *Qui Tam* Plaintiff-Relator